## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ANTALITA KING**

        **Plaintiff,**       **:**

                                  **Case No. 2:22-cv-2924**

     **v.**                           **Judge Sarah D. Morrison**

                                  **Magistrate Judge Chelsey M. Vascura**

**LAZER SPOT, INC.**        **:**

        **Defendant.**

## OPINION AND ORDER

Antalita King brings this action against Lazer Spot, Inc. based on Lazer Spot's alleged refusal to reinstate her employment upon her return from medical leave. (Compl., ECF No. 1, ¶ 21.) King and Lazer Spot filed cross-motions for summary judgment (ECF Nos. 19, 20), which are fully briefed and ripe for consideration.[1] For the reasons set forth below, Lazer Spot's Motion for Summary Judgment (ECF No. 19) is **GRANTED in part** and **DENIED in part**, and King's Motion for Partial Summary Judgment (ECF No. 20) is **GRANTED in part** and **DENIED in part**.

## I. STATEMENT OF FACTS

Lazer Spot hired King as a truck driver in January 2019. (ECF No. 8, ¶ 9.) She suffers from hypothyroidism, a condition that impairs her endocrine system.

---

[1] King requests oral argument on the motions. (ECF No. 22, PAGEID # 924; ECF No. 24, PAGEID # 954.) Pursuant to S.D. Ohio Civ. R. 7.1(b)(2), the Court finds oral argument to be unnecessary and not "essential to the fair resolution" of this case. King's request is **DENIED**.

(ECF No. 18-1, PAGEID # 56, 63.) In January 2021, King began experiencing adverse symptoms related to her thyroid disorder—including fatigue, dizziness, nausea, and headaches—that affected her vision and threatened her ability to safely operate a truck. (ECF No. 19-5 ("King Dep."), 117:16–118:6; ECF No. 18-1, PAGEID # 49–63.)

On January 15, King's supervisor (Area Manager Holly Smedley) permitted her to leave work to seek treatment for her symptoms. (ECF No. 18-6, PAGEID # 526, 547.) Later that day, King texted Smedley a picture of a note from her doctor stating that she was to be "[e]xcused from duty" until January 22. (ECF No. 19-1, PAGEID # 641.) Smedley forwarded the note to Terleder Dillon, Lazer Spot's workers' compensation manager responsible for administering leave under the Family and Medical Leave Act ("FMLA"). (ECF No. 18-6, PAGEID # 530.) Consistent with Lazer Spot policy, Dillon advised Smedley that King would need to "provide medical [documentation] showing her diagnosis and treatment" before she could return to work because "an updated DOT may be required."[2] (Id., PAGEID

---

[2] Before reinstating an employee from any type of medical leave, Lazer Spot required documentation from the employee showing: (1) the medication the employee was taking; (2) her prognosis; and (3) her treatment plan going forward. (ECF No. 18-4 ("Dillon Dep."), 30:24–31:8, 37:1-23.) Lazer Spot would then review these materials to determine whether the employee was fit to safely resume her duties and, if the employee was a driver, whether she needed to undergo a medical examination to satisfy the certification requirements mandated by the Department of Transportation ("DOT"). (Id., 14:10-22, 22:17–26:3; ECF No. 18-5 ("Mirasol Dep."), 15:6–17:10; ECF No. 18-6, PAGEID # 612 (noting 49 C.F.R. § 391.45).) Additionally, Lazer Spot's Employee Handbook included an FMLA policy, which provided in relevant part that "[w]hen seeking FMLA leave, employees may be required to provide … [m]edical documentation of fitness for duty before returning to work, if the leave was due to the employee's serious health condition." (ECF No.

# 528–29; Dillon Dep., 22:3-9.) Smedley texted King and confirmed approval of her FMLA leave but did not relay Dillon's instruction regarding the need for medical documentation. (*Id.*)

King subsequently texted Smedley two additional notes from her doctor, causing Lazer Spot to extend her leave until February 17. (ECF No. 19-1, PAGEID # 643, 645; ECF No. 18-6, PAGEID # 549.) During that time, Smedley asked how she was feeling, and King responded: "[M]y thyroid levels are waaaay outta control … I'm seeing a specialist now and my levels are dangerously high there [sic] afraid I may have a Thyroid storm because some of my organs (liver and kidneys) aren't functioning properly[.]" (ECF No. 19-1, PAGEID # 644.) Smedley replied with well wishes and verified that King's "spot" with Lazer Spot was "secure." (*Id.*)

When King notified Smedley that she had been cleared to return from medical leave on February 22, Smedley responded that Lazer Spot needed "paperwork" from King's doctor "saying what was wrong and that [she was] able to return [to] full duty." (ECF No. 19-1, PAGEID # 646–47.) By "paperwork," Smedley testified that she was referring to King's "medical records" surrounding her thyroid issue. (ECF No. 18-3 ("Smedley Dep."), 41:21–42:7.) However, King only texted Smedley a picture of a release form signed by her doctor that stated: "Patient had presented with signs of hypothyroidism. Evaluated today. Released to work without restrictions." (ECF No. 19-1, PAGEID # 648.)

On the morning of February 22, Smedley told King that she should not come

---

19-9, PAGEID # 869–70.)

into work that day because Lazer Spot had yet to approve her return. (ECF No. 19-1, PAGEID # 649.) Smedley also cautioned that King "might" need to undergo a DOT examination "thr[ough] [Lazer Spot]," to which King responded: "It's fine just let me know when." (*Id*.) Smedley did not send King's return-to-work form to Dillon until later in the day on February 22, despite having received it from King five days earlier. (ECF No. 18-6, PAGEID # 535.) Dillon reviewed the form and told Smedley that Lazer Spot needed "something that is more detailed," like "medical documentation from her doctor" in the form of "treatment notes." (*Id*.; Dillon Dep., 38:1-12.)

The next day, Smedley called King and told her that she would need to submit medical "discharge" paperwork before being reinstated. (ECF No. 19-1, PAGEID # 650; Smedley Dep., 48:7-14.) King later responded to Smedley with a text message that her doctor's office did not "give discharge papers" because "everything is done online." (ECF No. 19-1, PAGEID # 650.) King then sent a picture of another doctor's release form stating: "Patient Released. She had issue with hypothyroidism, chronic. Meds adjusted. Safe to resume work at this time without restriction." (ECF No. 18-6, PAGEID # 488.) Smedley forwarded King's second form to Dillon, who said that it was "not sufficient." (*Id*., PAGEID # 533.)

Smedley followed up with King about obtaining further documentation, but King explained that her medical records concerning her hypothyroidism could not be separated from her entire medical file, which she did not wish to disclose. (ECF No. 19-1, PAGEID # 652; King Dep., 123:15–124:13.) Smedley promised King that

4

she would communicate the problem to Lazer Spot, and she called Dillon shortly thereafter. (ECF No. 19-1, PAGEID # 653.) Dillon memorialized the call in an email, writing: "Per our conversation if [King] is unwilling to provide the requested medical information she will remain on leave until we proceed with admin term."[3] (ECF No. 18-6, PAGEID # 532.)

On March 5, King resigned from Lazer Spot via email:

> To whom this may concern, I Antalita King asked the manager Holly what was needed for me to return to work once I was released by my physician to return from medical leave, I was told a statement was needed saying what was wrong and that I was able to return full duty. I provided that information and then *was contacted the next day asking to provide more information (discharge papers, diagnosis, previous medications and current medications and why it was safe for me to return to work)* I provided another form from my doctor giving enough information that my doctor and myself agreed gave enough detail without violating my HIPPA rights. I was also told that I was going to have to see one of the companies recommended physicians and take a new D.O.T physical to return and I was willing to do that but I have not heard anything from my manager about my return, due to lack of communication and what I feel is a violation of my HIPPA rights I have been forced to seek other employment. I was released by my physician to return to work 2/22/21 the paperwork was sent to my manager Holly on 2/17/21 today's date is 3/5/21 and still I have heard nothing. As many of us as well as my self are suffering from this pandemic I am financially unable to continue to wait any further to hear back from Lazer spot on when I'll be able to return I'm sure you can understand and if you have any questions or concerns I can be reached on this email address thank you!

(ECF No. 19-4, PAGEID # 703 (emphasis added).)

The next day, a Lazer Spot manager called King to ask if she wanted to

---

[3] "Admin term" refers to administrative termination, which is the procedure by which Lazer Spot terminates employees who cannot return to work because of a medical condition. (Dillon Dep., 44:13-19.)

return to work. (King Dep., 127:6-24.) During that call, the manager directed King to contact Dillon to provide the requested records so she could come back to work, justifying the need for additional information by alluding to fraudulent conduct by other Lazer Spot truck drivers. (*Id.*, 128:1-10.) King responded that this rationale "didn't apply to [her]," and she did not contact Dillon. (*Id.*, 128:11-12, 131:23-24; Dillon Dep., 45:22–46:2.)

Three days after resigning from Lazer Spot, King started a new job CPC Logistics, Inc. (ECF No. 19-8, PAGEID # 837.)

King later filed a charge of discrimination against Lazer Spot with the Equal Employment Opportunity Commission ("EEOC"). (ECF No. 18-6, PAGEID # 492, 503.) She then commenced this action against Lazer Spot in July 2022. (Compl., *generally*.) She asserts that Lazer Spot (1) constructively discharged her and failed to accommodate her in violation of the Americans with Disabilities Act ("ADA") and Ohio Rev. Code § 4112.02 (Count I); and (2) interfered with her rights under the FMLA (Count II). (*Id.*, ¶¶ 22–38.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*,

6

12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

The standards upon which a court evaluates motions for summary judgment "do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

## III. ANALYSIS

### A. Disability Discrimination Claims

Employers are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

7

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Relevant here, discrimination is defined to encompass an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]" *Id.*, § 12112(b)(5)(A).

Disability discrimination claims, whether brought under the ADA or Ohio law, are analyzed in the same manner. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007); *see also Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) ("In light of the fact that Ohio's disability discrimination law parallels the ADA in all relevant respects, we apply the same analytical framework[.]"). The contours of an employee's claim depend on the kind of disability discrimination to which she was allegedly subjected—she may argue that her employer took adverse employment actions against her because of her disability (a "disparate treatment" claim), or that her employer failed to take reasonable steps to accommodate her disability (a "failure to accommodate" claim), or other theories of discrimination liability.

In this case, King contends that Lazer Spot "denied her accommodation for her disability in the form of job-protected leave"; "constructively discharged [her] by refusing to reinstate her without requiring her to provide medical information that was not job-related and not consistent with a business necessity"; and "terminated [her] because of her disability and her refusal to respond to a prohibited medical

8

inquiry." (Compl., ¶¶ 26–28.) Based on these allegations, Lazer Spot initially identified King's discrimination claim as a disparate treatment claim. (ECF No. 19, PAGEID # 624.) King subsequently clarified that she brought a failure to accommodate claim,[4] but she argues that she prevails "[e]ven analyzing the claim as one for disparate treatment." (ECF No. 20, PAGEID # 900; ECF No. 22, PAGEID # 935.) Accordingly, the Court will address both theories of liability below.

### 1. Failure to Accommodate Claim

Courts analyzing disability discrimination claims utilize "two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020). Because failing to make a reasonable accommodation falls within the ADA's definition of "discrimination," claims premised on an employer's failure to offer a reasonable accommodation "necessarily involve direct evidence [of discrimination] (the failure to accommodate)," such that courts "jettison the familiar *McDonnell Douglas* burden-shifting framework applicable in indirect-evidence

---

[4] King argues that summary judgment in Lazer Spot's favor is "inappropriate" because Lazer Spot did not address her failure to accommodate theory in its summary judgment motion. (ECF No. 22, PAGEID # 935.) Looking to her Complaint, she brings her disability discrimination claim under 42 U.S.C. § 12101 and Ohio Rev. Code § 4112.02. (Compl., PAGEID # 4.) The federal statute is the ADA's "Findings and purpose" provision, which does not provide a cause of action. The state statute concerns "unlawful discriminatory practices" and encompasses numerous causes of action. Because King alleges facts that could support a disparate treatment claim (*see, e.g.*, Compl., ¶ 27) and because she had the opportunity to put forth evidence with respect to her failure to accommodate theory in her own summary judgment briefing, the Court will not fault Lazer Spot for its initial analysis.

cases." *Kleiber,* 485 F.3d at 868–69 (citation omitted). Instead, to survive summary judgment on her failure to accommodate claim, King must demonstrate that she was disabled and that she was otherwise qualified for her position despite her disability (a) without accommodation from Lazer Spot; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.[5] *Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). If she meets her burden, Lazer Spot is still entitled to summary judgment if it can "prov[e] that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship." *Id.*

Lazer Spot does not dispute that King was disabled (ECF No. 21, PAGEID # 915), so the Court begins its analysis by looking at whether she was otherwise qualified for her position before turning to whether Lazer Spot has demonstrated that its request for further medical information was consistent with business necessity.

---

[5] In briefing the failure to accommodate claim, both parties apply the framework outlined in *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018), under which a plaintiff must show that (1) she was disabled; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) her employer failed to provide the necessary accommodation. (ECF No. 20, PAGEID # 900–01; ECF No. 21, PAGEID # 914–15.) But, as the Sixth Circuit acknowledged two years after *Brumley*, this framework improperly applies the indirect evidence test. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) ("*Kleiber*, our foundational case establishing that ADA failure to accommodate claims are analyzed pursuant to the direct test, controls.").

### a) King was arguably qualified for her position.

A "qualified individual" is one who can perform "the essential functions of their employment position with or without reasonable accommodation." 42 U.S.C. § 12111(8). Essential functions are "fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1). In this case, Lazer Spot employed King as a truck driver, so the ability to safely operate a commercial truck was undeniably essential to her position. (*See also* ECF No. 18-6, PAGEID # 471 (job description providing that "driving" was 85% of King's position).) Because King admittedly was at one time unable to perform this function due to her thyroid disorder, an accommodation was necessary for her to continue to work for Lazer Spot. Her proposed accommodation was medical leave and reinstatement. Thus, whether she was a qualified individual depends on whether she can prove that this proposed accommodation was reasonable and that she would be "capable of performing the essential functions of the job with the proposed accommodation." *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183–84 (6th Cir. 1996)); *see also* 42 U.S.C. § 12112(b)(5)(A) (requiring employers to "mak[e] reasonable accommodations").

"[M]edical leave can constitute a reasonable accommodation" under certain circumstances. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017). The same is true for reinstatement. *See, e.g.*, *Meggert v. Decorative Panels Int'l, Inc.*, No. 19-CV-13665, 2020 WL 3846334, at *2 (E.D. Mich. July 8, 2020) ("Job

protection may qualify as a reasonable accommodation [under the ADA] … under certain circumstances, the ADA requires an employer to allow an employee to return to their prior position following medical leave."); *Hastings v. Fayette Cnty. Sch.*, 320 F. Supp. 3d 966, 984 (W.D. Tenn. 2018) ("Plaintiff was entitled to return to her job once her accommodation ended."); *see also* EEOC Enforcement Guidance, Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, No. 915.002, 2002 WL 31994335, at *15 (Oct. 17, 2002) ("An employee with a disability who is granted leave as a reasonable accommodation is entitled to return to his/her same position unless the employer demonstrates that holding open the position would impose an undue hardship.").[6]

Assuming that medical leave and reinstatement could be considered reasonable accommodations for King, it is not clear that she could have performed her job upon return. *See Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1229 (6th Cir. 2022) ("We must therefore determine whether [Plaintiff] would be 'otherwise qualified' to perform her essential job functions with her proposed accommodation, in other words, when she returned to work."). In support of her

---

[6] Lazer Spot argues that the failure to reinstate an employee after medical leave does not constitute a failure to accommodate under the ADA, relying on *Ellis v. Tennessee*, No. 1:09-cv-131, 2010 WL 3057818 (E.D. Tenn. Aug. 2, 2010), *rev'd on other grounds*, 491 F. App'x 659 (6th Cir. 2012). (ECF No. 21, PAGEID # 915.) But, as the case law and EEOC Guidance indicate, an employer's act of allowing an employee to take medical leave necessarily contemplates the employee's eventual return—otherwise, the leave would amount to termination. *See Lee v. City of Columbus*, 636 F.3d 245, 256 (6th Cir. 2011) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 812 (6th Cir. 2004)) ("The [EEOC] Enforcement Guidance, while non-binding, 'constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'").

qualifications for the position, King relies on the two release forms from her doctor indicating that she could return to work, arguing that no further information was needed. (ECF No. 19-1, PAGEID # 648; ECF No. 18-6, PAGEID # 488.) However, the forms do not conclusively support her contention that she was qualified to drive on February 22. (*See* ECF No. 18-6, PAGEID # 488 (stating that King's condition was "chronic" and necessitated a rebalancing of her medication).) King also asserts that she was qualified because she possessed a DOT medical certification "valid" until November 2022 (and she was amenable to obtaining a new one, if necessary) and because her supervisor had "no issues" with her performance prior to her leave. (ECF No. 20, PAGEID # 904.) But a lack of prior performance issues is not dispositive of potential future issues, and the DOT certification King earned before going on leave does not inherently show she remained qualified upon her return, particularly considering DOT re-certification requirements. *See, e.g.*, *Daily v. Martin Transp. Sys., Inc.*, No. 1:12-cv-115, 2013 WL 5442750, at *8 (W.D. Mich. Sept. 30, 2013).

"Compliance with DOT safety regulations is an essential function of the job for a commercial driver." *King v. Mrs. Grissom's Salads, Inc.*, 187 F.3d 636 (6th Cir. 1999). Although King had a DOT certification that ordinarily would not have expired until November 2022, DOT regulations require "[a]ny driver whose ability to perform [her] normal duties has been impaired by a physical or mental injury or disease" to be medically examined and certified "as physically qualified to operate a commercial motor vehicle." (ECF No. 22, PAGEID # 932 (citing 49 C.F.R.

§ 391.45(g)).) The parties agree that King's thyroid condition had "indisputably impaired" her ability to drive. (*Id.*; ECF No. 21, PAGEID # 919.) Therefore, she likely lacked the necessary examination and re-certification when she attempted to return to Lazer Spot—meaning she was not then qualified to drive, even with her accommodation of medical leave and reinstatement. *See, e.g.*, *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999); *Roseman v. Linmore Invs., Inc.*, No. 1:17-cv-826, 2021 WL 3634706, at *4 (S.D. Ohio Aug. 17, 2021) (Rosen, J.); *Cummings v. Dean Transp., Inc.*, 9 F. Supp. 3d 795, 803 (E.D. Mich. 2014); *Daily*, 2013 WL 5442750, at *7. But because Lazer Spot policy prevents employees from obtaining DOT re-certification on their own (*see* Smedley Dep., 17:4-12, 23:1-12; Mirasol Dep., 31:19–32:9), the impetus was on Lazer Spot to facilitate the re-certification process for King when she sought to return to work, so the Court will not find her unqualified on this basis.

Thus, looking at the facts in the light most favorable to King, the Court will presume that she has shown that she was otherwise qualified and safe to drive upon reinstatement.

### b) Lazer Spot's request for additional medical information was a business necessity.

Lazer Spot insists that "providing evidence of the ability to safely resume driving after extended medical leave is an essential criterion of [King's] role." (ECF No. 21, PAGEID # 918.) Whether this requirement is essential depends on Lazer Spot's motivations for implementing it. *See Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (focusing on "the employer's motivation, not the applicant's perceptions,

14

or even an objective assessment of what qualifications are required for a particular position"). According to Lazer Spot, its request was necessary to "evaluate whether [King was] qualified to safely drive commercial vehicles" and to decide whether she needed to undergo a DOT examination for re-certification. (Dillon Dep., 14:10-22, 22:17–26:3; Mirasol Dep., 15:6–17:10.)

The ADA permits an employer to "require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity" and to "make inquiries into the ability of an employee to perform job-related functions." 29 C.F.R. § 1630.14(c). "Disability-related inquiries and medical examinations that follow up on a request for reasonable accommodation when the disability or need for accommodation is not known or obvious [ ] may be job-related and consistent with business necessity." EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees under the ADA, No. 915.002 (July 27, 2000) ("EEOC Inquiries Guidance").[7] Accordingly, "[e]mployers may require documentation supporting an employee's requested accommodation." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020) (citing *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000)); *see also Harvey v. Am.'s Collectibles Network, Inc.*, No. 3:09-CV-523, 2011 WL 182864, at *7 (E.D. Tenn. Jan. 20, 2011) (citation omitted) ("[T]he ADA ... allow[s] employers to make inquiries into an employee's medical conditions ... in order to

---

[7] Available at *https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#N_40_.*

reasonably accommodate that employee."). A disability-related inquiry or medical examination may also be "job-related and consistent with business necessity" when an employer "has a reasonable belief that an employee's present ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition." *Id*. Regardless of the basis, "[a]ny inquiries … must be limited in scope to what is needed to make an assessment of the employee's ability to work." *Id*.

Here, consistent with the ADA, Lazer Spot could request additional medical documentation from King before reinstating her. Lazer Spot sought materials from King identifying her prognosis, treatment plan, and current medications solely related to her thyroid condition. (Dillon Dep., 30:24–31:8, 37:1-23.) This request was a disability-related inquiry properly limited in scope.

Further, a reasonable jury could only conclude that Lazer Spot's request for further medical documentation was job-related and consistent with business necessity. When King sought to return to work, Lazer Spot asked for further information to support her request for reinstatement as an accommodation. *See, e.g.*, *Harvey*, 2011 WL 182864, at *7–8; *Tchankpa*, 951 F.3d at 812. The evidence supports the reasonableness of Lazer Spot's belief that it needed the materials to evaluate whether King's disorder continued to impair her ability to drive. King admits that she had been "incapacitated by her serious medical condition" and "suffering from debilitating effects of hypothyroidism." (ECF No. 20, PAGEID # 898, 903.) She had experienced "a crescendo of worsening symptoms," including fatigue,

16

dizziness, "bad" headaches, and nausea—which she acknowledged affected her vision and made her "not able to operate a vehicle"—to such an extent that she needed to leave work. (*Id.*, PAGEID # 897, 902; King Dep., 117:9–118:6.) While on leave, she had told Smedley that her "thyroid levels [were] waaaay outta control" and "dangerously high," that she was seeing a specialist, and that "some of [her] organs (liver and kidneys) [were not] functioning properly"—yet, less than a month later, she asked to come back to work. (ECF No. 19-1, PAGEID # 644.) And perhaps most importantly, in saying she could return to work, her physician noted the "chronic" nature of her hypothyroidism. (ECF No. 18-6, PAGEID # 488.)

King argues that Lazer Spot did not have a business need for any additional information and that its request for such information was not job-related or essential because it had already determined, based on the materials she did provide, that she needed to undergo a DOT examination. (ECF No. 24, PAGEID # 963–64.) But regardless of whether she needed the DOT examination, Lazer Spot had the right to evaluate whether she could safely drive in the first instance. "Workplace safety is a well-recognized business necessity." *Miller v. Whirlpool Corp.*, 807 F. Supp. 2d 684, 687 (N.D. Ohio 2011); *see also Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003) ("[B]usiness necessities may include ensuring that the workplace is safe and secure."). And Lazer Spot has shown that its request contributed to the achievement of that business necessity—based on its knowledge of the severity of King's condition and the length of her absence, its medical documentation requirement provided an effective way to

17

combat the possibility of employing a truck driver who posed a safety risk. (ECF No. 21, PAGEID # 918.)

Because Lazer Spot's request for medical documentation was "essential, and therefore a business necessity," Lazer Spot is entitled to summary judgment on King's failure to accommodate claim.

### 2.  Disparate Treatment Claim

King's ADA claim also fails as a disparate treatment claim. To establish a prima facie case of disparate treatment, King must show that (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment action; (4) Lazer Spot knew or had reason to know of her disability; and (5) the position remained open, or she was replaced. *Conners v. SpectraSite Commc'ns, Inc.*, 465 F. Supp. 2d 834, 854 (S.D. Ohio 2006) (Graham J.) (citing *Monette*, 90 F.3d at 1185). Here, King is unable to establish her prima facie case because she did not suffer an adverse employment action.

An adverse employment action is a "materially adverse change in the terms or conditions of ... employment because of [the] employer's conduct." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (citation omitted). If an employee voluntarily resigns, "[s]he cannot claim that [s]he suffered an adverse employment decision under the ADA[.]" *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999). King disputes the voluntariness of her resignation and argues that she suffered an adverse employment action when she was

"constructive[ly] discharge[d] in the form of not being reinstated." (ECF No. 22, PAGEID # 938.) She asserts that Lazer Spot presented her with an ultimatum such that she had "no prospect of returning, short of acquiescing to" Lazer Spot's request. (*Id.*, PAGEID # 940.)

To demonstrate a constructive discharge, King must adduce evidence to show that Lazer Spot (1) deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) did so with the intention of forcing her to quit. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568–69 (6th Cir. 2001) (citation omitted). A constructive discharge claim "depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004). Such a claim requires a finding that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008) (citations omitted).

King has not shown that Lazer Spot's request for medical documentation caused her working conditions to become objectively intolerable or was a deliberate attempt to force her to quit. *See Groening v. Glen Lake Cmty. Sch.*, 884 F.3d 626, 630 (6th Cir. 2018); *Tchankpa*, 951 F.3d at 814 ("[I]ntolerability is a demanding standard."). She did not suffer any demotion, reassignment to menial or degrading work, or harassment or humiliation. *Logan*, 259 F.3d at 569 (outlining factors courts consider for purposes of satisfying constructive discharge inquiry). Had Lazer

19

Spot required King to submit her entire medical file, the tolerability of the conditions and the foreseeability of King's resignation might be closer calls—but Lazer Spot only requested certain tailored information about her thyroid condition. At most, Lazer Spot inconvenienced King, which is insufficient. *See, e.g.*, *Mills v. Mason Consol. Sch. Dist.*, No. 07-CV-14648, 2008 WL 4457808, at *11 (E.D. Mich. Sept. 30, 2008).

Further, no reasonable person would find that King was constructively discharged when only two weeks passed between her intended return date and her resignation, and when Lazer Spot called her after she resigned to convince her to come back to work. (King Dep., 127:6-24); *cf. O'Donnell*, 833 F. App'x at 618 (plaintiff placed on leave for six months with no contact with employer); *Kulick v. Ethicon Endo-Surgery, Inc.*, 803 F. Supp. 2d 781, 783 (S.D. Ohio 2011) (Spiegel, J.) (plaintiff on leave for one month and did not resign but was terminated). That her resignation was involuntary is also discredited by her refusal to participate in a cooperative process with respect to her accommodation, including her failure to notify Lazer Spot that she could not afford to stay out any longer. (King Dep. 126:4-8); *see Tchankpa*, 951 F.3d at 812–13 (employer not liable for discrimination where employee resigned "before completing negotiations over their accommodation").

Finally, Lazer Spot's internal determination that King would be placed on "admin term" if she failed to provide the medical documentation does not make her resignation involuntary—she was unaware of that determination when she decided to resign. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 728–29 (6th Cir. 2014)

20

(plaintiff could not rely on information not "actually communicated" to him to show constructive discharge).

King cannot prove her prima facie case, and summary judgment in favor of Lazer Spot is therefore granted on her ADA disparate treatment claim.

## B. FMLA Interference Claim

The FMLA affords up to twelve weeks of leave in one year to eligible employees who cannot work because of a "serious health condition." 29 U.S.C. § 2612(a)(1)(D). "[T]he leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA]." Comments to the Family and Medical Leave Act of 1993, 73 FR 67934-01, 2008 WL 4898395, at *68040 (Nov. 17, 2008) ("FMLA Comments") (quoting S. Rep. No. 103-3, at 38 (1993)). Thus, "where both laws may apply, the applicability of each statute needs to be evaluated independently." *Id*.; *see also Albert v. Runyon*, 6 F. Supp. 2d 57, 67 (D. Mass. 1998) ("[T]hat the ADA does not preclude employers from requiring employees who suffer performance problems that may be health related to undergo medical examinations [or inquiries] does not mean that the FMLA permits all such examinations [or inquiries].").

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To prevail on an interference claim, a plaintiff must prove that (1) she was an FLMA-eligible employee; (2) the defendant was an "employer" as defined under the FMLA; (3) she was entitled to FMLA leave; (4) she gave the employer notice of her

intention to take leave; and (5) the employer denied or interfered with the FMLA benefits to which she was entitled. *Nuttall v. Progressive Parma Care Ctr., LLC*, No. 21-4199, 2022 WL 2952586, at *2 (6th Cir. July 26, 2022) (citing *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). A plaintiff seeking relief under the FMLA-interference theory must also establish that "the employer's violation caused [her] harm." *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (citation omitted). If a plaintiff demonstrates each of these elements, the employer must show that it had a "legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Id.*; *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (recognizing that *McDonnell Douglas* burden-shifting analysis applies to FMLA interference claims absent direct evidence). If the employer successfully carries its burden, the plaintiff can rebut the employer's reason by showing that the proffered reason had no basis in fact, did not actively motivate the adverse action, or was insufficient to warrant the action. *Donald*, 667 F.3d at 762 (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)).

Here, King is entitled to summary judgment because although Lazer Spot was permitted to seek additional information regarding her ability drive, it could not refuse to return her to work while doing so.

### 1. King has established a prima facie case of interference.

Lazer Spot admits that it is an employer under the FMLA and that King was an eligible employee who provided adequate notice of her need for medical leave. (ECF No. 8, ¶¶ 32–34.) It also does not dispute that King was entitled to FMLA

leave. (Mirasol Dep., 13:9-12.) Instead, Lazer Spot contends that it did not deny or interfere with King's FMLA benefits when it requested that she provide additional medical documentation and that, even if the Court finds otherwise, King cannot show that she suffered harm as a result. (ECF No. 19, PAGEID # 635.)

> **a)** **Lazer Spot interfered with King's FMLA benefits.**

The FMLA requires employers to restore employees returning from leave to their former positions or equivalent positions unless they are unable to perform the position's essential functions. 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.216(c); *Hoge v. Honda of Am. Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir. 2004) (observing that FMLA "creates the concomitant right" of restoration unless limitations apply). An employer violates the FMLA if the employer "interferes with the FMLA-created right to medical leave or to reinstatement after qualified leave." *Ritenour v. Tennessee Dept. of Human Servs.*, 497 Fed. App'x. 521, 530 (6th Cir. 2012) (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)). The right to reinstatement is "the linchpin" of the interference theory because "the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends." *Edgar*, 443 F.3d at 507 (citations omitted); *see also Marshall v. The Rawlings Co., LLC,* 854 F.3d 368, 384–85 (6th Cir. 2017) ("Interference occurs when an employer shortchanges an employee's leave time, denies reinstatement, or otherwise interferes with an employee's substantive FMLA rights.").

As a condition of restoration, the FMLA permits employers to enforce "a

uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work," known as a "fitness-for-duty certification." 29 U.S.C. § 2614(a)(4); 29 C.F.R. § 825.312(a). "An employer may seek a fitness-for-duty certification only with regard to the particular health condition that caused the employee's need for FMLA leave." 29 C.F.R. § 825.312(b). However, "[a]n employer may require that the certification specifically address the employee's ability to perform the essential functions of the employee's job" only if the employer provides the employee with "a list of the essential functions of the employee's job" and indicates that "the certification must address the employee's ability to perform those essential functions." *Id.* § 825.312(b).

If a fitness-for-duty certification is necessary for restoration, an employer must provide notice of this requirement to its employees; if such notice is given, the employer may delay an employee's restoration to employment until it receives the employee's certification. 29 C.F.R. § 825.300(d)(3); *id.* § 825.312(d)–(e). Upon receiving a fitness-for-duty certification, the employer may contact the employee's health care provider to clarify and authenticate the certification, but clarification may be requested only for the serious health condition for which FMLA leave was taken, and "[t]he employer may not delay the employee's return to work while contact with the health care provider is being made." *Id.* § 825.312(b).

The parties dispute whether Lazer Spot sent the FMLA-mandated notices to King, including (as relevant here) notice of the fitness-for-duty certification

24

requirement. (*Compare* Dillon Dep., 11:2–12:6, 15:1–17:21, 20:18-22, *with* ECF No. 20, PAGEID # 890.) The Court need not resolve this dispute because even assuming Lazer Spot did provide King with advanced notice of the need for a fitness-for-duty certification, she was not required to submit the medical records Lazer Spot requested.[8] There is no evidence indicating, nor do the parties argue, that Lazer Spot provided King with a list of essential functions or otherwise followed FMLA procedure such that her fitness-for-duty certification had to specifically address her ability to perform the essential functions of her position. 29 C.F.R. § 825.312(b). Thus, her fitness-for-duty certification needed only to "certify that [she was] able to resume work." *Id.* § 313(d) (citing *id.* § 825.312(a)). No further information was necessary for compliance purposes. *See, e.g.*, *Brumbalough v. Camelot Care Centers, Inc.*, 427 F.3d 996, 1003 (6th Cir. 2005) (interpreting earlier but substantially similar version of regulation to require only statement that employee can return to work and nothing more); *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 252–53 (3d Cir. 2014) (citing current version of 29 C.F.R. § 825.312(b) and observing that "an employee's healthcare provider must merely certify that the employee is able to resume work").

---

[8] For the same reason, the Court need not evaluate the sufficiency of the notice provided in Lazer Spot's Employee Handbook (ECF No. 19-9, PAGEID # 869–70). *See* 29 C.F.R. § 825.300(d)(3) ("If the employer handbook or other written documents (if any) describing the employer's leave policies clearly provide that a fitness-for-duty certification will be required in specific circumstances (e.g., by stating that fitness-for-duty certification will be required in all cases of back injuries for employees in a certain occupation), the employer is not required to provide written notice of the requirement with the designation notice, but must provide oral notice no later than with the designation notice.").

In this case, King provided two release forms from her physician that said she was able to resume work without restriction. (ECF No. 19-1, PAGEID # 648; ECF No. 18-6, PAGEID # 488.) At that point, Lazer Spot's duty to reinstate King was "triggered" under the FMLA. *Brumbalough*, 427 F.3d at 1004. When King attempted to return to work, Lazer Spot improperly interfered with that right when it told her that she could not. *See, e.g.*, *Clark v. Gospel Light Publications*, No. 106-CV-327, 2007 WL 2462654, at *7 (S.D. Ohio Aug. 27, 2007) (Dlott, J.); *Budhun*, 765 F.3d at 253; *Rutherford v. Peoria Pub. Sch. Dist. 150*, 228 F. Supp. 3d 843, 850 (C.D. Ill. 2017) ("Rutherford testified that he advised the District of his ability to return to work when he delivered the note … It was then Rutherford's right to be returned to work without delay.").

> **b)** **Lazer Spot's interference with King's FMLA rights caused her harm.**

"[T]he mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 394 (6th Cir. 2009). Rather, the statute "provides no relief unless the employee has been prejudiced by the violation[.]" *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (citing 29 U.S.C. § 2617(a)(1)); *see also id.* (citations omitted) ("The employer is liable only for compensation and benefits lost 'by reason of the violation,' for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion.").

26

Here, King alleges that she suffered "cognizable injury" beginning on February 22 (when Smedley told her to go home because Lazer Spot had not approved her return) through March 5 (when she resigned). (ECF No. 24, PAGEID # 958.) She points to economic harm in the form of (1) lost wages during this two-week period; and (2) underemployment with inconsistent work at the new position she started following her resignation from Lazer Spot. (ECF No. 22, PAGEID # 934; King Dep., 73:15-24; ECF No. 22-1, PAGEID # 942.)

King suffered "actual monetary losses" when Lazer Spot interfered with her right to reinstatement. *See Brumbalough*, 427 F.3d at 1007 (observing that FMLA provides for damages "only insofar as they are the actual monetary losses of the employee[,] such as salary and benefits and certain liquidated damages"). Although King received her requested leave, her harm arose when Lazer Spot refused to reinstate her, causing her to remain on unpaid leave for two weeks. (ECF No. 22-1, PAGEID # 942.) However, to the extent King suffered underemployment after leaving Lazer Spot, courts in similar contexts have found that "the period of liability will end if [a] plaintiff voluntarily quits [her] employment with the defendant absent a constructive discharge." *Booker v. Syngenta Crop Prot., LLC*, No. 2:14-CV-02604-JPM, 2015 WL 5883512, at *10 (W.D. Tenn. Oct. 8, 2015) (citation omitted) (Title VII); *see also id.* ("[T]he law precludes an award of back pay or front pay after the date of [ ] resignation" if no constructive discharge found). King voluntarily resigned and did not suffer a constructive discharge, meaning Lazer Spot's liability ended upon her departure.

27

Thus, King has established her prima facie case.

### 2. Lazer Spot has articulated a legitimate reason for its actions.

An employer may lawfully take an action that prevents an employee from exercising her statutory right to FMLA reinstatement, but only if the action would have occurred regardless of the employee's request for or taking of FMLA leave. *Arban*, 345 F.3d at 401; *Albert*, 6 F. Supp. 2d at 69 (observing that employer "needs some reason beyond an employee's having taken FMLA leave to justify ordering a fitness-for-duty examination"). The burden now shifts to Lazer Spot to articulate a legitimate, non-FMLA-related reason for its actions. *Wallace*, 764 F.3d at 585.

According to Lazer Spot, it asked for the documentation to ensure King was fit to safely resume her job duties pursuant to its internal policy, which applies to all employees who return from any type of medical leave.[9] (Dillon Dep., 14:10-22,

---

[9] Lazer Spot employees testified that the medical documentation would be used to determine whether King needed a new DOT recertification. (Dillon Dep., 14:10-22, 22:17–26:3; Mirasol Dep., 15:6–17:10.) But Lazer Spot does not offer this as a legitimate reason for its request, instead focusing solely on its own internal policy. (ECF No. 23, PAGEID # 944 ("[W]hether or not her condition warranted an updated DOT certification is irrelevant to the issue at the heart of her FMLA claim—whether Lazer Spot was entitled to request medical documentation pursuant to its own policy.").) Had Lazer Spot pointed to the DOT regulations surrounding recertification, the Court is not convinced that they provide a reason unrelated to King's taking of FMLA leave. Even if so, Lazer Spot's VP of Human Resources testified that that the materials King did provide were "enough for Lazer Spot to determine [whether King] needs a new DOT recertification." (Mirasol Dep., 29:5-20.) A review of the DOT regulations also indicates that recertification was likely necessary for King regardless of her provision of medical records because the parties agree that she was impaired by her thyroid condition, which caused fatigue, dizziness, nausea, and headaches that affected her vision, such that she would be medically disqualified. (ECF No. 22, PAGEID # 932; ECF No. 21, PAGEID # 919; 49 C.F.R. § 391.45(g); 49 C.F.R. § 391.41(b).)

22:17–26:3; Mirasol Dep., 15:6–17:10; ECF No. 19, PAGEID # 634.) This reason is sufficient at this stage of the analysis. *Garavaglia v. George P. Johnson Project: Worldwide, Inc.*, No. 20-CV-12714, 2023 WL 3826456, at \*10 (E.D. Mich. June 5, 2023), *appeal dismissed sub nom. Garavaglia v. Project: Worldwide, Inc.*, No. 23-1612, 2023 WL 9060870 (6th Cir. Nov. 8, 2023) (articulating that defendants' burden is one of production).

### 3.   King has sufficiently rebutted Lazer Spot's reason.

The burden lastly shifts to King to produce evidence that casts doubt on Lazer Spot's explanation. *Donald*, 667 F.3d at 762. King argues that Lazer Spot's internal policy was insufficient to warrant Lazer Spot's actions because Lazer Spot was not permitted to apply a more stringent return-to-work requirement than the FMLA. (ECF No. 22, PAGEID # 929.)

Employers may not justify further fitness-for-duty inquiries beyond the initial FMLA certification for return to duty by claiming that the certification, if adequate under the FMLA, was nonetheless insufficient for its business needs. *Albert*, 6 F. Supp. 2d at 68. If such were the case, "the FMLA's prohibition on requiring any 'additional information' beyond 'a simple statement of an employee's ability to return to work' would be nullified." *Id.* Put differently, an employee's FMLA leave cannot itself provide a job-related need for further inquiries where the employer has no present reason to doubt the employee's ability to work. *Id.* ("The ADA and the FMLA do not conflict if the ADA's business necessity requirement requires more than an employee's having taken FMLA leave."). Instead, an

employer may make medical inquiries of an employee who provided a sufficient fitness-for-duty certification only "where the employee's ongoing limitations may interfere with her ability to work." *Id.* at 69; *see also* 29 C.F.R. § 825.212(h).

Here, Lazer Spot had a sufficient business justification to make further medical inquiries of King—among other reasons, King's physician certified her as fit to return, but he also deemed her condition to be "chronic" and necessitating a rebalancing of medication. (ECF No. 19-1, PAGEID # 644; ECF No. 18-6, PAGEID # 488.) Under the circumstances, Lazer Spot reasonably believed that King suffered from a continuing disorder at the time she sought reinstatement that could affect her job performance.

Nevertheless, to the extent Lazer Spot conditioned King's reinstatement on her provision of additional medical records beyond her sufficient fitness-for-duty certification, its conduct was improper. Although the FMLA does not grant a right to reinstatement to employees who are unable to perform the essential functions of their positions, 29 C.F.R. § 825.216(c), Lazer Spot could have addressed its concern by reaching out to King's medical provider, or sending her for an examination, or making further appropriate medical inquiries of her, but, in each instance, only *after* reinstating her. The FMLA prohibits Lazer Spot from delaying King's return simply because it was "second-guessing" her fitness-for-duty certification. *Id.* § 825.312(b) ("[T]he employer may contact the employee's health care provider for purposes of clarifying and authenticating the fitness-for-duty certification … The employer may not delay the employee's return to work while contact with the health

care provider is being made."); *id.* § 825.312(h) (emphasis added) ("*After an employee returns from FMLA leave*, the ADA requires any medical examination at an employer's expense by the employer's health care provider be job-related and consistent with business necessity."); *Albert*, 6 F. Supp. 2d at 69 ("Once [Plaintiff] returns to work, [Defendant] may order her to undergo a fitness-for-duty examination if it has sufficient reason under the ADA/Rehabilitation Act and its own agency regulations."); *Brumbalough*, 427 F.3d at 1004; *see also* FMLA Comments, 2008 WL 4898395, at *68036 (clarifying that before employee's return to work, employer must accept employee's certification and return employee to employment; after return to employment, FMLA protections no longer apply, and employer may require medical examination or inquiries consistent with ADA).

That Lazer Spot's concurrent internal policy required particular medical documentation does not justify its failure to reinstate King. (ECF No. 19, PAGEID # 634.) "[A]n employer may not apply a more restrictive leave policy than provided under the FMLA[.]" *Killian v. Yorozu Auto. Tennessee, Inc.*, No. 4:02-CV-39, 2004 WL 4737654, at *6 (E.D. Tenn. Aug. 16, 2004), *aff'd but criticized on other grounds*, 454 F.3d 549 (6th Cir. 2006). Employers may enforce internal policies that are equally or less stringent than the FMLA's requirements, but they may not rely on inconsistent or conflicting policies. *See Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 720 (6th Cir. 2003) ("[T]he FMLA does not permit an employer to limit his employee's FMLA rights by denying them whenever an employee fails to comply with internal procedural requirements that are more strict than those contemplated

by the FMLA."); *Clayton v. Shelby Cnty. Gov't*, No. 08-2612-TMP, 2013 WL

12340144, at *9 (W.D. Tenn. Aug. 22, 2013). For instance, courts have upheld

employer policies that create separate employee obligations unrelated to the

FMLA's substantive rights, such as policies requiring employees to call in when on

leave or provide doctor's notes supporting absences. *See Clayton*, 2013 WL

12340144, at *9 (discussing cases). On the other hand, courts strike down policies

that conflict with the FMLA's provisions, such as policies requiring employees to

notify a specific department of an absence or submit certification materials sooner

than the statutory deadline. *See, e.g.*, *Calvin*, 346 F.3d at 722–23; *Harrigan v. Dana

Corp.*, 612 F. Supp. 2d 929, 942 (N.D. Ohio 2009).

In this case, by requiring additional medical information beyond certification

that Ms. King was "able to resume work," Lazer Spot's more stringent internal

policy conflicted with the FMLA.[10] Thus, King was obligated only to follow the

---

[10] The cases Lazer Spot cites to the contrary are not on point. (ECF No. 19, PAGEID # 634 (citing *Verkade v. U.S. Postal Serv.*, 378 F. App'x 567 (6th Cir. 2010), *Allen*, 331 F. App'x at 389, and *Harrell v. United States Postal Serv.*, 445 F.3d 913 (7th Cir. 2006)).) In *Harrell*, a postal service employee provided return-to-work certifications to USPS pursuant to USPS's policy as permitted by the FMLA, but his collective bargaining agreement required further medical documentation, and he was fired when he refused to provide the additional materials. *Harrell*, 445 F.3d at 916–17. The court ruled against the employee, citing the FMLA's provision stating that its certification requirements may not "supersede a … collective bargaining agreement[.]" *Id.* at 923–927. Here, King's relationship with Lazer Spot is not governed by a collective bargaining agreement. Additionally, the issue in *Harrell* was whether an employer's internal policy, which was informed by a collective bargaining agreement, can impose more stringent return-to-work requirements than the "simple certification by the employee's own physician" permitted by the FMLA, not whether an employer's internal policy standing alone that requires more than a "simple certification" is lawful. *Id.* at 925. Because *Allen* and *Verkade* are both part of *Harrell*'s progeny, they are unhelpful for the same reasons.

FMLA requirements in this regard. *See Cavin*, 346 F.3d at 723 ("[W]here an employer's internal policies conflict with the provisions of the FMLA, the FMLA controls and an employee need only comply with the requirements of the Act to invoke its protections.").

By not reinstating King upon her provision of fitness-for-duty certifications, Lazer Spot interfered with her FMLA rights.

### 4. King's Entitlement to Liquidated Damages

King also moved for summary judgment on whether she should be awarded liquidated damages. (ECF No. 20, PAGEID # 906.) The FMLA provides that, in addition to compensatory damages specified in § 2617(a)(1)(A)(i)–(ii), Lazer Spot "shall be liable for an amount of liquidated damages equal to the amount of wages, salary, employment benefits, or other compensation denied or lost to an employee, plus interest, by reason of the employer's violation." *Chandler v. Specialty Tires of Am. (Tennessee), Inc.*, 283 F.3d 818, 827 (6th Cir. 2002) (citing 29 U.S.C. § 617(a)(1)(A)(iii)). The Court may reduce that award to only compensatory damages if Lazer Spot "proves to the satisfaction of the court that the act or omission which violated [the FMLA] was in good faith and that [Lazer Spot] had reasonable grounds for believing that the act or omission was not a violation of [the FMLA]." 29 U.S.C. § 2617(a)(1)(A)(iii). Stated differently, Lazer Spot "must therefore show *both* good faith *and* reasonable grounds" for not reinstating Ms. King. *Chandler*, 283 F.3d at 827 (emphasis in original).

However, instead of affirmatively demonstrating that it acted reasonably and

in good faith, Lazer Spot asserts that Ms. King's allegations fail to show bad faith or unreasonable grounds. (*Id.* ("These allegations thus fail to provide any support for the notion that Lazer Spot acted in bad faith or relied on unreasonable grounds for its actions … None of the facts alleged by Plaintiff move the needle toward a plausible showing that Lazer Fact acted in bad faith or had unreasonable grounds for its actions.").) This is insufficient. The closest Lazer Spot comes to carrying its burden is its statement that "Lazer Spot's inquiry was made with respect to its own internal policies for required documentation, which are grounded in the entirely reasonable justification of safety." (ECF No. 21, PAGEID # 921.) But, as explained above, Lazer Spot could not legitimately require additional documentation from Ms. King to assess safety pursuant to its own policies.

## IV.    CONCLUSION

As the circumstances of this case emphasize, the ADA and the FMLA are two distinct regulatory schemes, and the prohibitions of these different statutes are not coextensive. For the reasons set forth above, Lazer Spot's Motion for Summary Judgment (ECF No. 19) is **GRANTED in part** and **DENIED in part**, and King's Motion for Partial Summary Judgment (ECF No. 20) is **GRANTED in part** and **DENIED in part**. The Court will set a damages trial by separate order.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**

34